Filed 11/2/22  P. v. Lazo CA2/1
Opinion following transfer from Supreme Court

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B304615 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA144673-01) |
| v. | |
| ALEJANDRO LAZO, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Roger Ito, Judge.  Affirmed in part and reversed in part with directions.

Cheryl Lutz, under appointment by the Court of Appeal; and Janet Uson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Paul M. Roadarmel, Jr., Julie Harris, Noah P. Hill and Eric J. Kohn, Deputy Attorneys General for Plaintiff and Respondent.

On April 29, 2017, Southside Whittier gang members Alejandro Lazo and Reyna Gomez carjacked a Nissan Pathfinder and used the vehicle in a drive-by shooting spree that left one person dead and several others injured. Lazo and Gomez were charged with one count of carjacking, one count of murder, and 14 counts of attempted murder. They were tried separately.[1]

A jury convicted Lazo of one count of first degree murder (count 1; Pen. Code, § 187, subd. (a))[2], 12 counts of willful, deliberate, and premeditated attempted murder (counts 2, 3, 6–11, 13–15, & 17; §§ 187, subd. (a), 664), and one count of carjacking (count 12; § 215, subd. (a)).[3] As to each count, the jury found true gang allegations under section 186.22, subdivision (b)(4), and firearm enhancement allegations under one or more of subdivisions (b), (c), (d), and (e)(1) of section 12022.53. The court sentenced Lazo to prison for 53 years plus 320 years to life, and imposed certain fines and assessments.

In a prior opinion, we reversed three of Lazo's convictions of attempted murder (counts 2, 8, and 14) for insufficient evidence. We also agreed with Lazo that the prosecution's gang expert gave

---

[1] In March 2020, we affirmed Gomez's convictions of one count of murder, 10 counts of attempted murder, and one count of carjacking in an unpublished opinion. (*People v. Gomez* (Mar. 4, 2020, B293727).) We reversed convictions on four counts of attempted murder and related enhancements based on instructional error. (*Ibid.*)

[2] Subsequent unspecified statutory references are to the Penal Code.

[3] The jury acquitted Lazo of two charges of attempted murder.

inadmissible hearsay testimony to support the predicate offenses for the gang enhancements, but held that the error was harmless with respect to all of the gang enhancements but one. In addition, we agreed with Lazo that the court erred in imposing sentence enhancements on most of the convictions under both section 186.22, subdivision (b) and section 12022.53. We rejected Lazo's claims that the evidence was insufficient to establish that the crimes were committed for the benefit of or in association with a criminal street gang, and that the prosecutor committed misconduct in various ways during the trial.

After we filed our opinion but before Lazo's conviction became final, the Legislature enacted Assembly Bill No. 333 (2021−2022 Reg. Sess.) (Assembly Bill No. 333) and Senate Bill No. 567 (2021−2022 Reg. Sess.) (Senate Bill No. 567). Assembly Bill No. 333 altered both the substantive and procedural law regarding gang enhancements under section 186.22. Among other changes, the law adds requirements for proving predicate offenses for gang enhancements. (§ 186.22, subd. (e)(1) & (2).) Senate Bill No. 567 creates new requirements for imposing an upper term sentence. (See § 1170, subd. (b).)

In January 2022, the Supreme Court granted Lazo's petition for review and transferred the matter to us with directions to vacate our decision and reconsider the cause in light of Assembly Bill No. 333 and Senate Bill No. 567).

We vacated our opinion and have received and considered supplemental briefs from the parties. In addition to supplemental briefs filed pursuant to rule 8.200(b) of the California Rules of Court, we requested and received supplemental briefs addressing the question whether Assembly Bill No. 333 unconstitutionally amends the Gang Violence and

3

Juvenile Crime Prevention Initiative (Proposition 21, as approved by voters, Primary Elec. (Mar. 7, 2000)) and, if so, whether and how its unconstitutionality impacts the issues in this case.

We again reverse three of Lazo's convictions of attempted murder (counts 2, 8, and 14) for insufficient evidence. We agree with Lazo and the Attorney General that, even if Assembly Bill No. 333 unconstitutionally amended Proposition 21 in some respects, any such amendment does not impact this case. We conclude that Assembly Bill No. 333 applies retroactively and requires us to reverse the remaining gang enhancements. Lastly, because our disposition requires a new sentencing hearing during which the court will apply the law in effect at the time he is resentenced, we need not address the application of Senate Bill No. 567.

## FACTUAL SUMMARY

The events described below took place on April 29, 2017.

### A. *Carjacking of Johnny G.'s Pathfinder (Count 12)*

At about 2:15 p.m., Johnny G. was in the driver's seat of his parked green Nissan Pathfinder sports utility vehicle (SUV) when a white four-door sedan pulled up behind him. Lazo and Gomez got out of passenger seats of the white car and approached the Pathfinder. Lazo walked to the driver's side of the Pathfinder and Gomez to the passenger side. Lazo pointed a gun at Johnny G., and told him to get out of the car. Johnny G. complied because he was afraid Lazo would shoot him. After Johnny G. walked to the back of the Pathfinder, Lazo got in the driver's seat and Gomez got into the passenger seat. Lazo then drove away.

As Johnny G. began to walk away, two men got out of the white car, approached Johnny G. and asked, "Where are you from?" Johnny G. said, "I don't bang." The two men said something like, "this is South Side," then returned to their car and followed the Pathfinder.[4]

## B. *Attempted Murder of Tommy A. (Count 15)*

At about 3:30 p.m., Tommy A. was in an alley behind a coffee shop. A green Pathfinder pulled up next to him. Lazo, the driver of the Pathfinder, handed a gun to Gomez and told her, "shoot him." Gomez aimed the gun at Tommy A.'s face, then lowered the gun and fired one shot, hitting Tommy A. in his groin area. Gomez then raised the gun, aimed it at Tommy A.'s head, and pulled the trigger. The gun, however, "jammed." As Lazo attempted to clear the jam, the car began to roll away. Tommy A. then ran to the coffee shop to ask for help.

---

[4] During trial, Johnny G. testified that Lazo looked "similar" to the man who had pointed the gun at him, but he was "not a hundred percent sure" it was him. Some witnesses to other charged crimes positively identified defendant during trial as a principal and other witnesses either could not identify defendant or expressed some uncertainty about their identification. On appeal, however, defendant does not challenge the sufficiency of the evidence supporting the jury's finding that he was a principal in each of the crimes of which he was convicted and the sufficiency of evidence supporting that finding is apparent from the record and we may reasonably infer from the evidence, viewed in a light favorably to the judgment, that the male participant in each of the crimes is Lazo and the female participant is Gomez. Our factual summary reflects these inferences.

### C.  *Attempted Murder of Michael L. (Count 17)*

At about 3:41 p.m., Rosemary A. and her husband Roy A. were in their car, waiting for the light to change at the intersection of Colima and Lambert in Los Angeles County. Rosemary A. was driving.  A car, which Roy A. described as a dark green or black SUV, was in front of them.  A black Honda was in the next lane, adjacent to the driver's side of the SUV in front of them.  Rosemary A. could see one person inside the Honda, who was later identified as Michael L.  Rosemary A. saw an arm holding a gun extended from the driver's side of the SUV in front of her and point it at the Honda.  She then heard one shot and saw the front passenger window of the Honda shatter. The SUV turned right and "took off."  Rosemary A. began to follow the SUV and told Roy A. to get the vehicle's license number.  Rosemary A. then turned back to check on the person in the Honda.  Michael L. had been injured by broken glass from the shattered window.  A surveillance video recording of the incident was shown to the jury.[5]

### D.  *Attempted Murders of Benjamin G. and Maria G. (Counts 13 and 14)*

At about 4:00 p.m., Benjamin G. was driving his Ford Excursion on Imperial Highway.  His wife Maria G. was in the passenger seat.  They stopped at the intersection at La Mirada Boulevard.  A green Pathfinder pulled up next to them on their driver's side.  Lazo was driving the Pathfinder and Gomez was in the front passenger seat.  The light changed to green and, as the two cars proceeded through the intersection, Benjamin G. heard

---

[5] The parties did not arrange for transmission of the video surveillance evidence to this court.

two loud knocks against his car.  Benjamin G. looked at the adjacent Pathfinder and saw Lazo "pointing a gun sideways." Then Benjamin G.'s window shattered, and a bullet hit his arm and ribs.  The Pathfinder sped away.  In addition to the shattered window, Benjamin G. found two holes in the driver's door of his car "very close to [his] head."

### E.  *Attempted Murder of Anthony E. (Count 11)*

At about 4:00 p.m., Anthony E. was driving his car westbound on Imperial Highway between Santa Gertrudes Avenue and Ocaso Avenue.  He heard a noise and a rear side window in his car shattered.  He then noticed a dark green SUV driving away from him eastbound on Imperial Highway. He later discovered a hole in the driver's side back seat of his car and a fragment of a bullet inside the hole.

### F.  *The Shootings at the Intersection of Santa Gertrudes Avenue and Alicante Road*

At about 4:00 p.m., Lazo and Gomez were involved in a series of shootings at the intersection of Santa Gertrudes Avenue and Alicante Road.

#### 1.  Murder of Jose Sahagun (count 1) and attempted murder of Jesus A. (count 2)

Jose Sahagun was driving a white SUV southbound on Santa Gertrudes Avenue and pulled up to the intersection at Alicante Road, where he waited for the light to change. Sahagun's father-in-law, Jesus A., was in the front passenger seat.  Sahagun's wife and three other family members were in rear seats of the SUV.  Lazo drove the Pathfinder up alongside the driver's side of Sahagun's white SUV.  Gomez got out of the passenger side of the Pathfinder, approached the driver's

side of Sahagun's SUV, and fired at least one shot, and possibly as many as three shots, at Sahagun from less than one foot away. Sahagun died as a result of gunshot wounds. There was no evidence that anyone else in the car, including Jesus A., was injured or that any bullets hit or entered the cabin of the Sahagun's SUV other than the bullet or bullets that hit Sahagun.

### 2. Attempted murders of Lisa R. (count 3), Julio R. (count 6), Leslie G. (count 7), Robert G. (count 8), Leticia A. (count 9), and William K. (count 10)

Across the intersection from where Gomez shot Sahagun, several northbound cars were stopped at the red light. Lisa R. and her 10-year-old daughter were in the lead car in the left-turn lane. Lisa R. saw Gomez shoot at the window of Sahagun's SUV. After Gomez returned to the Pathfinder, the Pathfinder proceeded slowly through the intersection. When it was nearly adjacent to Lisa R.'s car, Lazo pointed a semiautomatic handgun at Lisa R. and fired one shot at her. The bullet shattered her driver's side window and the rear passenger window. Lisa R. received a small cut under her eye as a result. Her daughter was not injured.

Jorge N. was heading northbound on Santa Gertrudes Avenue in the number two lane and stopped at the intersection with Alicante. Jorge N. heard several gunshots, but did not know where they came from. He noticed a commotion, then saw the green Pathfinder driving southbound slowly through the intersection. He saw Lazo holding a gun outside the window and shooting at cars in the northbound lanes. To Jorge N., it appeared that the driver was taking aim at cars and shooting directly at them. At one point, the shooter pointed the gun at

8

Jorge N. and he "had no choice but to just get out of the way." He then heard "the last shot." Jorge N. was not injured and his car was not hit.

Julio R. was in his GMC Sierra and waiting in a northbound lane for the light to change. He heard a gunshot and noticed a commotion and someone running on the other side of the intersection. He heard a second shot and saw the driver's side window of Sahagun's SUV shatter. The green Pathfinder then moved southbound across the intersection as an arm holding a gun extended from the driver's window of the Pathfinder. As the Pathfinder reached the south side of the intersection, Lazo fired shots at each of the three cars in front of him. When the Pathfinder reached a point adjacent to Julio R.'s vehicle, Julio R. saw Lazo point the gun at him and pull the trigger twice, but it did not fire. As the car passed him, Julio R. heard more gunshots.

Leticia A. was behind two other cars in the northbound-facing left-turn lane on Santa Gertrudes Avenue. She saw Gomez shoot at Sahagun's SUV. After Lazo drove through the intersection and shot at the cars in front of him, he pulled up adjacent to Leticia A. and fired a gun at her as she ducked.

Leslie G. and her husband Robert G. were in a car facing northbound at the Santa Gertrudes Avenue/Alicante Road intersection. They were in the "number [one] lane," about three cars away from the limit line. Leslie G. was driving and Robert G. was in the front passenger seat. Their two-year-old son was in the backseat. Leslie G. heard three gunshots and saw the green Pathfinder cross the intersection and pull up to a point "parallel" to her car and stop. Although she was in the lane to the right of the left-turn lane, no car was next to her in the left

9

turn lane. Lazo raised a gun and pointed it in her direction; Leslie G. told Robert G. to duck. Lazo fired two or three shots at their car. A bullet hole and a bullet fragment were found in the driver's side mirror of Leslie G.'s car.

William K. was at the Santa Gertrudes Avenue/Alicante Road intersection heading northbound. He heard three shots, and saw the Pathfinder drive southbound across the intersection. The Pathfinder stopped, and Lazo pointed a gun at William K., fired, and hit William K.'s windshield.

### G.    *The Aftermath*

At 7:00 p.m., Los Angeles County Sheriff's Deputies located Johnny G.'s Pathfinder near Mayberry Park in Whittier. On the ground about 6 to 10 feet away from the driver's side door, they found a "live round" of "ammo." A subsequent search of the Pathfinder revealed a live .22 caliber cartridge, fired cartridge casings, and a box of .22 caliber ammunition.

Between 7:30 p.m. and 8:00 p.m., a black Chrysler and a white Kia sedan were in the parking lot of a motel in Santa Fe Springs. According to a motel guest, a male passenger got out of the Chrysler, said, "Hey, homey," and fired eight or nine gunshots at the white Kia. The shooter returned to the Chrysler, which drove away. The white Kia then drove out of the motel parking lot.

At about 8:00 p.m., Gomez, driving the white Kia sedan, pulled up alongside Joyce F. on Carmenita Road and honked her horn repeatedly. Gomez rolled down her window and told Joyce F. that she had been shot and asked for help. Lazo was in the passenger seat of the Kia and had also been shot. Joyce F. noticed that the passenger side of the car and rear windshield had "a lot" of bullet holes.

10

An ambulance and police officers arrived. Police found a .22 caliber handgun between Lazo's waistband and the seatbelt clip. As Lazo was being placed on a gurney, .22 caliber ammunition fell from his pants pocket onto the ground.

DNA recovered from a beer can in the Pathfinder was consistent with Lazo's and Gomez's DNA. DNA found on the Pathfinder's steering wheel was consistent with Lazo's DNA. Gunshot residue was found on Lazo and Gomez. Ballistics evidence connected the .22 caliber gun found next to Lazo with the cartridge cases found in the Pathfinder and the bullet recovered from Sahagun's body.

### H. *Gang Evidence*

Los Angeles County Sheriff's Deputy Claudia Maldonado testified that Lazo has "SSW"—an acronym for Southside Whittier—tattooed on his arm and head. The deputy encountered Lazo at Mayberry Park on April 4 and April 9, 2017, and each time Lazo "self-admitted" at that time to being a gang member. On the second occasion, Lazo was with Gomez, who also admitted being "from Southside Whittier." Maldonado prepared field identification—or F.I.—cards for each interaction, which noted their gang affiliation, tattoos, and gang monikers.

Deputy Fernando Sarti testified as a gang expert. Sarti testified that the primary activities of the Southside Whittier gang are vandalism, petty thefts, robberies, sales of narcotics, carjacking, possession of handguns, shootings, and murders. The gang's "territory" includes Mayberry Park, where Southside Whittier gang members congregate.

Deputy Sarti testified about two "predicate" crimes purportedly committed by Southside Whittier gang members. The crime in each case was being a felon in possession of a

11

firearm. One of the crimes is evidenced by a court minute order reflecting a conviction of Jose Antonio Garcia on March 18, 2016. The other crime is shown by a court minute order reflecting a conviction of Richard Arredondo on October 23, 2015. Deputy Sarti's testimony that Garcia and Arredondo were members of the Southside Whittier gang was based on his review of field identification cards and "arrest cards" concerning the individuals, tattoos on Garcia "depicting his gang affiliation," and booking photographs of Arredondo "where he depicts his gang affiliation."

Deputy Sarti further testified that Lazo and Gomez are active members of the Southside Whittier gang. He based this opinion on photographs of tattoos on Lazo and Gomez reflecting membership in the Southside Whittier gang and field identification cards prepared by others.

Over defense objection, the prosecutor gave Deputy Sarti a hypothetical that mirrored the facts shown by evidence in this case. Deputy Sarti stated his opinion that the crimes described in the hypothetical were committed for the benefit of, and in association with, a criminal street gang. The activity benefitted a gang, he explained, because the firing of a weapon "enhances the reputation of the gang within the gang world as well as within the community." The crimes are committed in association with a gang because "there's two individuals from the same gang working together to commit these crimes."

## I. *Defense*

The defense did not present any witnesses or affirmative evidence.

## DISCUSSION

### A.  *Sufficiency of the Evidence of Attempted Murder on Counts 2, 8 and 14*

The convictions on counts 2, 8, and 14 were for the attempted murders of Jesus A., Robert G., and Maria G., respectively.  These alleged victims were in the front passenger seats of the cars driven by Sahagun, Leslie G., and Benjamin G., respectively.  The prosecution relied on a kill zone theory of criminal liability as to these crimes and the court instructed the jury on that theory.[6]  Lazo contends that the evidence is insufficient to support the convictions on these counts under a kill zone theory.[7]  We agree.

---

[6] As to count 2, the court instructed the jury as follows: "A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.'  In order to convict the defendant of the attempted murder of Jesus [A.] in count 2, the People must prove that the defendant not only intended to kill Jose Sahagun, but also either intended to kill Jesus [A.], or everyone within the kill zone.  If you have a reasonable doubt whether the defendant intended to kill Jose Sahagun or intended to kill Jesus [A.] by killing everyone in the kill zone then you must find the defendant not guilty of the attempted murder of Jesus [A.]"  The court gave the same instruction on counts 8 and 14, substituting the names of Robert G. and Maria G., respectively for the name of the alleged victim.

[7] The Attorney General contends that the evidence is sufficient to support the convictions under the kill zone theory and does not argue that the convictions can be affirmed under any other theory.

13

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Avila* (2009) 46 Cal.4th 680, 701.)

"To prove the crime of attempted murder, the prosecution must establish 'the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' [Citation.] When a single act is charged as an attempt on the lives of two or more persons, the intent to kill element must be examined independently as to each alleged attempted murder victim; an intent to kill cannot be 'transferred' from one attempted murder victim to another under the transferred intent doctrine." (*People v. Canizales* (2019) 7 Cal.5th 591, 602 (*Canizales*).)

Although the doctrine of transferred intent does not apply to the crime of attempted murder, our Supreme Court has "embraced the concept of a *concurrent* intent to kill as a permissible theory for establishing the specific intent requirement of attempted murder." (*Canizales, supra*, 7 Cal.5th at p. 602.) This concept was applied in *People v. Bland* (2002) 28 Cal.4th 313, where the court approved of a "kill zone" theory of attempted murder, which applies " 'when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity.' " (*Id*. at p. 329.) The Attorney General in this instant case relies

on the kill zone theory to support the convictions on counts 2, 8, and 14.

In *Canizales*, the Supreme Court clarified that "the kill zone theory for establishing the specific intent to kill required for conviction of attempted murder may properly be applied only when a jury concludes:  (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm— that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death—around the primary target[;] and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm.  Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm." (*Canizales*, *supra*, 7 Cal.5th at p. 607.)

The *Canizales* court further stated:  "In determining the defendant's intent to create a zone of fatal harm and the scope of any such zone, the jury should consider the circumstances of the offense, such as the type of weapon used, the number of shots fired (where a firearm is used), the distance between the defendant and the alleged victims, and the proximity of the alleged victims to the primary target.  Evidence that a defendant who intends to kill a primary target acted with only conscious disregard of the risk of serious injury or death for those around a primary target does not satisfy the kill zone theory. . . . [T]he kill zone theory does not apply where 'the defendant merely subjected persons near the primary target to lethal risk.  Rather, in a kill zone case, the defendant has a primary target and

15

reasons [that] he cannot miss that intended target if he kills everyone in the area in which the target is located.'" (*Canizales*, *supra*, 7 Cal.5th at p. 607.)

The *Canizales* court anticipated that, in light of its refinement of the kill zone test, "there will be relatively few cases in which the theory will be applicable" and cautioned trial courts to "provide an instruction to the jury only in those cases where the court concludes there is sufficient evidence to support a jury determination that the *only* reasonable inference from the circumstances of the offense is that a defendant intended to kill everyone in the zone of fatal harm." (*Canizales*, *supra*, 7 Cal.5th at p. 608; see *People v. Cardenas* (2020) 53 Cal.App.5th 102, 112 (*Cardenas*) [under *Canizales*'s "strict requirements of the kill zone theory[,] the defendant must have *specifically intended to kill everyone* in the area around the primary target as a means of killing the primary target"].) "The use or attempted use of force that merely *endangered* everyone in the area is insufficient to support a kill zone instruction." (*Canizales*, *supra*, 7 Cal.5th at p. 608.)

*People v. Booker* (2020) 58 Cal.App.5th 482 (*Booker*) is instructive. In *Booker*, codefendants Damon Booker and George Lewis were members of the Poccet Hood gang. (*Id.* at p. 494.) They and other Poccet Hood gang members were in a liquor store where they saw Jose Raya speaking with someone who was a member of a Poccet Hood rival gang. (*Id.* at pp. 488, 502.) Raya was not a member of a gang. (*Id.* at p. 488.) Raya and his girlfriend, Reann Lott, left the liquor store in Lott's car. Raya was driving and Lott was in the front passenger seat. (*Ibid.*) Lewis, with Booker in the passenger seat, followed Raya in a white car. As Lewis and Booker pulled up next to Raya, Raya

16

told Lott to duck down.  As she ducked, Lott saw a hand emerge from the front passenger window of the white car and heard five shots fired at their car.  (*Ibid.*)  (Other evidence indicated that Booker fired as few as three and as many as seven shots.) (*Id.* at p. 500, fn. 12.)  Raya was hit and died as a result of multiple gunshot wounds to his head.  (*Id.* at pp. 488–489.) Booker and Lewis were convicted of the murder of Raya and the attempted murder of Lott.  (*Id.* at p. 487.)  With respect to the attempted murder count, the court had instructed the jury on the kill zone theory.  (*Id.* at p. 496.)

Division Seven of this court reversed the attempted murder conviction.  After an extensive discussion of the development of the Supreme Court's kill zone jurisprudence, culminating in *Canizales*, the court explained:  "[T]he type and extent of force used do not support a reasonable inference Booker and Lewis intended to kill Raya by killing everyone in the car's cabin.  At most, the evidence supports a reasonable inference [that] Booker and Lewis acted with conscious disregard of the risk Lott might be seriously injured or killed. . . . Booker as sole shooter fired a total of three to seven shots directed at the front driver's side of Lott's stationary car.  Further, Booker's shots were directed at Raya at close range, striking him twice in his head and once in his arm in a manner consistent with Raya defensively raising his left arm during the shooting.  The driver's side front window of Lott's car was shattered, but there were no bullet holes in the car's body or doors that would have reflected a spray of bullets. Nor was there evidence any bullets reached the front passenger side of the car where Lott was sitting, and Lott was not injured. . . . And finally, there was no evidence suggesting

17

Booker used a rapid-firing semiautomatic or automatic weapon." (*Booker*, *supra*, 58 Cal.App.5th at p. 500, fn. omitted.)

Turning to the instant case, there was insufficient evidence to support a kill zone instruction with respect to count 2— the alleged attempted murder of Jesus A. The evidence was undisputed that the Pathfinder pulled up alongside the SUV driven by Sahagun. Jesus A. was in the front passenger seat of Sahagun's vehicle. Gomez got out of the Pathfinder, approached the driver's side of Sahagun's SUV and fired one to three shots at Sahagun from less than one foot away. The Attorney General concedes, this evidence demonstrates that "Gomez specifically targeted Sahagun." There was no evidence of a "spray of bullets" within Sahagun's vehicle or other evidence from which a jury could reasonably infer that Gomez intended to kill Jesus A. or anyone else in the vehicle as a means of ensuring Sahagun's death. There was, therefore, insufficient evidence to support a finding that Gomez intended to kill Jesus A. under a kill zone theory.

We reach the same conclusion with respect to count 8 (the attempted murder of Robert G.) and count 14 (the attempted murder of Maria G.). These alleged victims were the passengers in cars driven by Leslie G. and Benjamin G., respectively. The Attorney General concedes that the drivers—the persons closest to Lazo's gun—were the specific targets in both cases. In neither instance is there substantial evidence that Lazo "intended to create a zone of fatal harm—that is, an area in which [he] intended to kill everyone present to ensure the primary target's death—around the primary target." (*Canizales*, *supra*, 7 Cal.5th at p. 607.) There is no evidence that a bullet entered the cabin of Leslie G. and Robert G.'s car and the only bullet that entered

18

Benjamin G. and Maria G.'s car hit Benjamin G. Although the distances between Lazo's gun and his targeted victims were farther than the distance between the shooter and target in *Booker*, the slightly greater distances are not enough to compel a different result. As in *Booker*, "[a]t most, the evidence supports a reasonable inference [that the shooter] acted with conscious disregard of the risk [that the passengers] might be seriously injured or killed." (*Booker*, *supra*, 58 Cal.App.5th at p. 500.) Subjecting the passengers to such "lethal risk," however, is insufficient to support the application of the kill zone theory. (*Canizales, supra*, 7 Cal.5th at p. 607; accord, *Cardenas, supra*, 53 Cal.App.5th at p. 116.)

The Attorney General argues that "[f]iring more than enough bullets to kill the driver and passenger at close range meets the definition of creating a kill zone." No authority is cited for this statement and, as *Booker* demonstrates, it is incorrect. Although the shooter in *Booker* fired as many as seven shots at the driver sitting next to a front seat passenger, the evidence was insufficient to support a kill zone instruction. Here, the additional shots Gomez and Lazo fired undoubtedly endangered others in the cars driven by Sahagun, Benjamin G., and Leslie G., but such endangerment, without more, "is insufficient to support a kill zone instruction." (*Canizales*, *supra*, 7 Cal.5th at p. 608.)

Because we conclude that the convictions on counts 2, 8, and 14 must be reversed for insufficient evidence under our high court's kill zone authorities, we need not consider Lazo's challenges to the kill zone instructions on those counts or to alleged misconduct by the prosecutor in arguing the kill zone theory to the jury.

19

## B. *Gang Enhancements*

### 1. Assembly Bill No. 333

Lazo contends that, in light of Assembly Bill No. 333, we must reverse all the gang enhancements (§ 186.22, subd. (b)(4)) in his sentence. We agree.[8]

To prove a gang allegation under section 186.22, subdivision (b)(4), the prosecution must show that the defendant committed an enumerated offense "for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members." (*Ibid.*) A criminal street gang is an organized association whose members "engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f).)

When Lazo committed his crimes and at the time of his trial, to establish a "pattern of criminal gang activity," the prosecution was required to show that at least two persons had committed or attempted to commit at least two offenses from a list of predicate crimes. (See former § 186.22, subd. (e).) Our Supreme Court held that this requirement could be satisfied with "evidence of the defendant's commission of the charged offense

_____

[8] Because we reverse the gang enhancements, we need not address Lazo's contention that the trial court erred by imposing both the gang enhancements and firearm enhancements under section 12022.53, subdivisions (b) through (e)(1). We agree with Lazo and the Attorney General that in the event the prosecution successfully retries Lazo for any of the gang enhancements, the court may not impose both the gang and firearm enhancements. (See *People v. Brookfield* (2009) 47 Cal.4th 583, 596; § 12022.53, subd. (j).)

and the contemporaneous commission of a second predicate offense by a fellow gang member" (*People v. Loeun* (1997) 17 Cal.4th 1, 10 (*Loeun*)) other than aiding and abetting the charged offense (*People v. Zermeno* (1999) 21 Cal.4th 927, 932).

In enacting Assembly Bill No. 333, the Legislature narrowed the definition of a pattern of gang activity. Most notably, the offense with which the defendant is currently charged cannot be used as one of the two predicate offenses. (§ 186.22, subd. (e)(2).) In addition, both predicate offenses must have been committed "within three years of the date the current offense is alleged to have been committed," by gang "members," and must have been for the "common[ ] benefit[ ] [of] a criminal street gang." (§ 186.22, subd. (e)(1).) Moreover, "the common benefit" of the offense must be "more than reputational." (§ 186.22, subds. (e)(1) & (g).) These changes to the elements of section 186.22, which benefit defendants by making the enhancement more difficult to prove, are applicable to all persons, such as Lazo, whose judgments are not yet final. (*People v. Tran* (2022) 13 Cal.5th 1169, 1206−1207; *People v. Salgado* (2022) 82 Cal.App.5th 376, 380; *People v. Sek* (2022) 74 Cal.App.5th 657, 667 (*Sek*).)

We requested the parties brief the question whether Assembly Bill No. 333 unconstitutionally amended Proposition 21 and, if so, whether and how its unconstitutionality impacts the issues in this case.[9] Although the Attorney General and Lazo

---

[9] Our Supreme Court is currently considering whether Assembly Bill 333 unconstitutionally amended Proposition 21, if applied to the gang-murder special circumstance codified in section 190.2, subdivision (a)(22). (*People v. Rojas* (2022) 80 Cal.App.5th 542 (*Rojas*), review granted Oct. 19, 2022, S275835).

disagree as to whether the new law is unconstitutional as it applies to the gang murder special circumstance that was enacted under Proposition 21 (compare *Rojas*, *supra*, 80 Cal.App.5th 542, review granted) with *People v. Lee* (2022) 81 Cal.App.5th 232, 236−245 (*Lee*), review granted Oct. 19, 2022, S275449), they agree that any unconstitutional amendment of Assembly Bill No. 333 does not impact the issues in this case. We agree.

As the parties explain, Proposition 21 did not amend the definition of a criminal street gang in ways relevant to this case and, to that extent, "the voters left intact the Legislature's power to amend the definition of a criminal street gang in section 186.22, subdivision (f)." (*Lee, supra,* 81 Cal.App.5th at p. 242, review granted; accord, *People v. Lopez* (2022) 82 Cal.App.5th 1, 22 ["[b]ecause Proposition 21 made no substantive changes to subdivision (f) of section 186.22, Assembly Bill 333's additions and deletions are constitutionally permissible"], petn. for review pending, petn. filed Sept. 9, 2022, S276331.) Although Assembly Bill No. 333's changes to that definition may affect the conduct punishable under provisions that were enacted by Proposition 21, the ability of the Legislature to amend the definition of a criminal street gang implies, in the absence of an expression of the voters' contrary intent, the ability to impact the punishment provisions effected thereby. (See *Lee*, *supra*, 81 Cal.App.5th at pp. 242−243, review granted.) Here, the voters gave no indication of any intent to "freeze [the] statutory definition" of a criminal street gang for purposes of the provisions under which Lazo was punished. (See *ibid.*; accord, *Lopez, supra,* 82 Cal.App.5th at p. 24, petn. for review pending.) Therefore, as Lazo and the Attorney General agree, even if Assembly Bill

22

No. 333 unconstitutionally amended Proposition 21 is some respects, it did not do so in any way that impacts this case.[10]

Turning to the application of Assembly Bill No. 333 to this case, we agree with Lazo and the Attorney General that we must reverse the gang enhancement findings in this case under Assembly Bill No. 333. The jury decided the gang enhancement allegations according to instructions that did not include the provisions of Assembly Bill No. 333. In particular, the jury was not instructed, as Assembly Bill No. 333 now requires: that the offenses with which Lazo was charged could not be used as a predicate offense for purposes of establishing a pattern of criminal gang activity (§ 186.22, subd. (e)(2)); that the predicate offenses must have been committed "on separate occasions or by two or more members" and for the "common[ ] benefit[ ] [of] a criminal street gang"; (§ 186.22, subd. (e)(1)); and that "the common benefit" of the offenses must be "more than reputational" (§ 186.22, subds. (e)(1) & (g)). (See CALJIC No. 17.24.2 (Oct. 2022 update).) The instructions thus effectively omitted these required elements of the enhancement.

In this situation, "reversal is required unless 'it appears beyond a reasonable doubt' that the jury verdict would have been the same in the absence of the error." (*Tran, supra*, 13 Cal.5th at p. 1207.) The Attorney General does not contend that this test is satisfied here. As we noted in our former opinion in this case, the

---

[10] Our holding on this point is narrow and limited to the case-specific issue upon which we asked for briefing. We express no view on the issue pending in the Supreme Court in *Rojas, supra,* 80 Cal.App.5th 542, review granted, concerning the constitutionality of Assembly Bill No. 333 as it applies to the special circumstance under section 190.2.

main source of evidence of predicate offenses came from testimony by Deputy Sarti, which was based not on his personal knowledge, but rather on court minute orders. These minute orders are admissible to show the fact of the convictions, but not the perpetrators' gang memberships. (See *People v. Garcia* (2020) 46 Cal.App.5th 123, 171−172 ["the use of a record of a prior conviction to prove any fact other than the fact of conviction violates the Sixth Amendment"].) The perpetrators' gang affiliations are "case-specific facts that must be proved by independently admissible evidence." (*People v. Valencia* (2021) 11 Cal.5th 818, 839.) In our former opinion, we held that the error in admitting this hearsay testimony was harmless with respect to all of the convictions but one because the jury found that Lazo committed all of the current charged offenses for the benefit of a criminal street gang, and each current charged offense could serve as a predicate offense for the subsequent offenses. (See *Loeun, supra,* 17 Cal.4th at p. 10.) But under the newly enacted section 186.22, subdivision (e)(2), a currently charged offense cannot be a predicate offense for proving a pattern of criminal gang activity. Thus, there was insufficient evidence to prove the gang enhancements under the new version of the law.

### 2.     Proceedings Upon Remand

If the prosecution fails to produce sufficient evidence to support an enhancement under the law existing at the time of trial, this is equivalent to an acquittal, and the prosecution may not retry the defendant. (*People v. Garcia* (2014) 224 Cal.App.4th 519, 526.) If, on the other hand, the evidence to support an enhancement is insufficient only because of the retroactive application of a new law, " 'the double jeopardy clause of the

Constitution will not bar a retrial.' " (*Sek*, *supra*, 74 Cal.App.5th at p. 669.)

In our former opinion in this case, we held that there was sufficient evidence under the law that existed at the time of trial to support all of the gang enhancements but the one for carjacking. Upon remand, therefore, the prosecution will have the option to retry Lazo for all of the gang enhancements but the one for carjacking.

**C.** *Sufficiency of the Evidence to Support the Gang Enhancements*

Lazo attacks the gang enhancements on a second ground,[11] arguing that, under the law that existed at the time of trial, the evidence was insufficient to support the finding that he committed his crimes "for the benefit of, at the direction of, or in association with any criminal street gang." (§ 186.22, subd. (b)(1).) We reject the argument.

Whether a crime is committed in association with a gang can be established by expert testimony (*People v. Albillar* (2010) 51 Cal.4th 47, 63), provided it is not "purely conclusory" (*People v. Prunty* (2015) 62 Cal.4th 59, 85). Here, Deputy Sarti testified

---

[11] In Discussion part B, *ante*, we reverse the gang enhancements due to the retroactive application of Assembly Bill No. 333. That holding does not render Lazo's additional argument here regarding the sufficiency of the evidence moot. In part B, we held that the prosecution could elect to retry all but one of the gang enhancements upon remand. If Lazo were correct regarding the sufficiency of the evidence of the enhancement under the law as it existed at the time of trial, that would not be the case. (See *People v. Garcia, supra*, 224 Cal.App.4th at p. 526.)

25

that gang members will work with other gang members because they can trust each other. "They would rather take someone within their gang that they trust and they know are going to be loyal to them in case they get caught." Committing crimes with another trusted gang member, Deputy Sarti testified, increases the likelihood that they will complete the crime without getting caught. Gang members will also commit crimes with one another so that each has someone that can confirm that he or she committed the crimes, which can enhance the individual's standing within the gang. In response to a hypothetical question that mirrored the facts of this case, including that two gang members committed the crimes together, Deputy Sarti opined that the hypothetical criminals were acting in association with a gang because "there's two individuals from the same gang working together to commit these crimes."

In addition to Deputy Sarti's testimony, there is evidence that Lazo's and Gomez's crime spree began as a broader Southside Whittier gang-related enterprise. The carjacking that provided the vehicle for committing the shootings involved not only Lazo and Gomez, but at least two others who were together with Lazo and Gomez in the white car that pulled up behind the Pathfinder. As Lazo and Gomez drove away in the Pathfinder, two men got out of the white car and told Johnny G. words to the effect of, "this is South Side." Jurors could easily infer from that statement that the carjacking was gang-related and reasonably infer that the shooting spree that followed soon afterward was connected with the carjacking and similarly gang-related.

Based on the foregoing, the evidence was sufficient to support findings that Lazo committed the crimes in association with a criminal street gang.

26

**D.    *Exhibit 49—Minute Order re Lazo's Prior Offense***

The prosecution introduced exhibit 49 while questioning Deputy Sarti about predicate offenses.  The first three pages of the exhibit are minute orders issued in the case of *People v. Jose Antonio Garcia* (L.A. Sup. Ct. case No. VA141398).  As discussed above, the minute orders reflect the conviction of Garcia of the crime of being a felon in possession of a firearm.  Following the first three pages are five pages of court minute orders in the case of *People v. Alejandro Lazo* (L.A. Sup. Ct. case No. VA139882), presumably the defendant in this case.  These pages appear to reflect Lazo's conviction by plea in February 2016 of violating section 245, subdivision (a)(1) and section 520.[12]  The document also states that the court sentenced Lazo to three years in prison on each count, with the sentence on the second count to run concurrently with the first.

Lazo contends that the inclusion of the five pages referring to his prior conviction constitutes prosecutorial misconduct and deprived him of his right to a fair trial.

Lazo has forfeited any argument concerning the admission of the extraneous pages in exhibit 49 by failing to object to them below.  (See *People v. Ashmus* (1991) 54 Cal.3d 932, 976; *People v. Valdez* (2004) 32 Cal.4th 73, 124–125.)  As the Attorney General

---

[12] The minute order does not indicate the substance of section 245, subdivision (a) or section 520.  Section 520, at the relevant time, prescribed the punishment for extortion of "any money or other property from another, under circumstances not amounting to robbery or carjacking, by means of force, or any threat."  (Former § 520.)  Section 245, subdivision (a)(1) criminalizes assault with a deadly weapon other than a firearm.

points out, the inclusion of the pages referring to Lazo could have been avoided if counsel had raised the issue any time prior to the commencement of jury deliberations. Lazo did not, however, raise any objection to the document or otherwise bring the issue to the court's attention in any way.

In any event, the inclusion of the extra pages, which the Attorney General describes as a "careless mistake," does not constitute a "deceptive or reprehensible" prosecutorial method (see *People v. Hill* (1998) 17 Cal.4th 800, 819) and did not deprive Lazo of a fair trial. Nor is there any basis for concluding that the exhibit was prejudicial under any standard. The only reference to exhibit 49 during trial occurred when the prosecutor drew Deputy Sarti's attention to "just the top page" of the exhibit, and asked the deputy if it indicated that Jose Antonio Garcia committed the crime of being a "felon with a firearm." Deputy Sarti said it did. Neither side thereafter referred to the exhibit or mentioned it during closing arguments. The jury did not ask any question about the document. Indeed, there is no reason to believe that the jury, if it looked at the document at all, looked beyond the "top page"—the only page that the prosecutor indicated was relevant. Even if a juror did notice the additional pages attached to the Garcia minute orders, there is no reason to believe that the information had any effect on the jury's verdict.

Lazo further contends that his counsel was constitutionally deficient by failing to examine exhibit 49 and object to the offending pages of the exhibit. Even if we assume that counsel acted below the standard of care by failing to inspect the exhibit or object to it, Lazo has made no showing that these deficiencies in counsel's performance were prejudicial under *Strickland v. Washington* (1984) 466 U.S. 668.

28

### E. *Exhibit 48—Notation of Parole on Field Identification Cards*

The prosecution introduced the two field identification cards concerning Lazo as evidence that Lazo had admitted to Deputy Maldonado to being a member of the Southside Whittier gang. On the back side of the cards, there is a box that is checked in front of the word, "parole." Lazo contends that his status as a parolee was irrelevant and unduly prejudicial under Evidence Code section 352, and that the reference to "parole" should have been redacted.

The argument is forfeited by failing to raise it below. In any case, the prosecutor's failure to redact the reference to parole does not constitute misconduct. The prosecutor did not refer to the offending statement or question any witness about it, and there is no basis in the record for concluding that it came to the attention of any juror or, if it did, that it had a prejudicial effect on the verdict. For the same reason, Lazo's argument that he was deprived of the effective assistance of counsel because his counsel failed to object to the reference is without merit.

### F. *Prosecutor Comments on Ballistics Expert Testimony*

Lazo contends that the prosecutor committed prejudicial misconduct by vouching for the credibility of the ballistics evidence. There was no error.

A criminalist and ballistics expert testified to her opinion that the gun found next to Lazo in the white Kia fired bullets connected to cartridges found in the Pathfinder and a bullet taken from Sahagun's body. The expert explained how she compared the marks on the bullet cartridges found in the Pathfinder and on the bullet taken from Sahagun's body with

marks on bullets and bullet cartridges created when she test-fired Lazo's gun.

After her testimony, the court permitted a juror to submit a question to the ballistics expert asking:  What is the probability that markings on the bullets and cartridges could match both the tested gun and another gun?  The expert answered:  "This is not a field like DNA in which there is [*sic*] genetic populations or probability that can be stated at this point.  There is research being conducted to better answer that question," including the development of "software and . . . algorithms with computers and technology to supplement the examiner's opinion and develop some better statistics around the field, but today there is no number that I can give.  It's not analogous to DNA."  On cross-examination regarding the question, the expert stated that, "as an examiner[,] what I'm looking for is a certain quantity and quality of marks that have duplicated, that have reproduced, not 100 percent."

During closing argument, the prosecutor addressed the juror's question and the expert's response.  He acknowledged that the expert stated that "there's no statistical analysis for [ballistics testing]," and added:  "The alternative is this.  The alternative is that this defendant here is seen in that car, in that green Pathfinder, his DNA is found in that green Pathfinder.  His DNA is found in the Kia.  He is found with a gun that has his DNA in the magazine of that gun.  He's got that gun in his hip pocket.  The alternative to this gun being the same gun used by this defendant to shoot Tommy [A.], the alternative is that somebody else on that particular Saturday, on April 29th of 2017, another male Hispanic, female Hispanic got a green Pathfinder, went to all these various locations, shot all these people and

30

somehow the gun that they had . . . leaves the exact same ballistic imprints that's found on the gun that this defendant had that night. That is—I'm just going to say it. That is impossible. Okay? Because that's the alternative. Because all the evidence points to this defendant being the shooter, this defendant being the driver, this defendant having the gun. And to say that there's a possible other gun that might have been used in those series of facts, it's just not possible." Lazo did not object to these statements.

During his rebuttal argument, the prosecutor reiterated his point: "[T]he alternative [to the argument that Lazo's gun is the gun used in the subject shootings] is somebody else has the exact same firearm in the exact same car, a green Pathfinder, a white Kia, and they went on the same exact rampage that they did[,] and it just so happens that the two guns that shoot exactly alike and leave the exact same defects, one of them falls into [Lazo's] hip pocket. And that is unreasonable. That is impossible." Again, Lazo did not object.

On appeal, Lazo contends that the prosecutor's comments amounted to "unsworn testimony without being subject to cross-examination" and created "a significant danger the jurors would misunderstand the prosecutor's comments to mean they were not required to independently assess the ballistics expert's testimony."

Lazo forfeited this argument by failing to object to the prosecutor's statements. Even if the argument has been preserved, it is without merit. We agree with the Attorney General that the prosecutor's comments did not constitute improper vouching for the ballistics expert or were otherwise outside the "wide latitude" that prosecutors are given during

argument.  (*People v. Bonilla* (2007) 41 Cal.4th 313, 336–337; see *People v. Frye* (1998) 18 Cal.4th 894, 971 [prosecutor does not commit improper vouching when his comments about a witness's testimony "are based on the 'facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief' "].)

### G.    *Alleged Vouching for Deputy Sarti*

Lazo argues that the prosecutor committed misconduct by improperly vouching for Deputy Sarti during the prosecutor's rebuttal argument.  Even if the argument was not forfeited by Lazo's failure to object during trial, he has failed to establish prejudicial error.

During cross-examination of Deputy Sarti, defense counsel asked how often Deputy Sarti, in testifying as a gang expert, concluded that the crimes described in a prosecutor's hypothetical were committed for the benefit of or in association with a gang. Deputy Sarti answered, "[p]robably 80 or 90 percent" of the time.

During the defense closing argument, counsel argued that Deputy Sarti is "given a hypothetical that exactly mirrors this case, and then he is asked[,] is this done for the benefit of, direction, or in association with a criminal street gang?  He says yes.  Of course."

During the prosecutor's rebuttal argument, the prosecutor addressed Deputy Sarti's testimony that he opines favorably for the prosecution 80 or 90 percent of the time.  Counsel argued: "But what he also testified is this.  Look, in the other [10] to 20 percent of the time I don't see it.  I don't see it.  I don't see the relationship between gangs and a crime and I don't think it's done for the benefit of a gang.  And what he told you is this.  If a D.A. asks me to do it, I tell them no.  If a D.A. asked me to do it, I

would get up on the stand and I would say no. There's no reason for him to put his career on the line and get up here and just simply rubber stamp anything that the prosecution is asking him to say." Lazo asserts that this last sentence, which he quotes in isolation, constitutes improper vouching for Deputy Sarti.

Lazo did not object to the statement below and his challenge on appeal is therefore forfeited. Even if the argument is not forfeited, the challenged statement is within the " 'wide latitude' " counsel is given to fairly comment on the evidence. (*People v. Wharton* (1991) 53 Cal.3d 522, 567.)

### H. *Alleged Misconduct During Prosecutor's Re-argument on Count 1*

After two days of deliberations, the jury informed the court that it had "agreed on all the counts but one." The remaining count was count 1, the murder of Sahagun. The court read the verdicts on the counts the jury had reached, which included the findings that the attempted murders were committed willfully, deliberately, and with premeditation. Upon inquiry from the court, the jury asked for clarification regarding aiding and abetting liability (to which the court referred them to jury instructions on the point) and requested re-argument with respect to "the criteria for first degree murder as it applies to this case."

Lazo contends that the prosecutor committed misconduct during the re-argument by lowering the prosecutor's burden of proof, misstating the evidence, and misstating the law. These arguments have been forfeited by failing to raise the issue below. Even if not forfeited, we would reject them on the merits as we explain below.

33

The prosecutor argued that in determining whether Lazo committed first degree murder of Sahagun, "you [the jurors] have to look at the totality of what happened [that] day," not at the shooting of Sahagun in "isolation alone." The prosecutor proceeded to recount the shooting of Tommy A., where Lazo "hands the gun to [Gomez] and tells her to shoot him." The prosecutor further described the other attempted murders, which the jurors had previously found were committed with premeditation, willfulness, and deliberation. The prosecutor then argued: "You all found that each of those individuals in the car that were lined up in front of him he had the premeditation, the willfulness and deliberation to kill each of those as well. So it's unlikely—in fact, I'd say it's unreasonable for him to have that premeditation and willfulness and deliberation to kill Tommy [A.], Michael [L.], Benjamin [G.], Maria [G.], Anthony [E.] and then get to the Sahagun family and not have that specific intent to kill him, and then when he gets the gun back and goes on his shooting spree again attempt[s] to kill Lisa [R.], William [K.], Leticia [A.], Julio [R.]—you found that he had the premeditation, willfulness and deliberation in the attempted murders of the people preceding Mr. Sahagun and after Mr. Sahagun. And to believe that when it came to Mr. Sahagun he did not have the premeditation and willfulness and deliberation, I think that goes counter to the evidence. So based on the facts that we have here of that intent that he had to kill from the very beginning of . . . Tommy [A.] all the way to the end of . . . William [K.], he had that same premeditation and willfulness and deliberation to kill along the way when it came to Mr. Sahagun as well."

34

Lazo contends that the prosecutor's argument "improperly bootstrapped the unresolved murder charge to the multiple guilty verdicts already rendered" and that the effect of the argument "was to remove the elements of the murder charge from the jury's consideration and to lower the prosecution's burden of proving all elements of the murder charge beyond a reasonable doubt." We disagree. The prosecutor argued, in essence, that the jury can infer from the fact that Lazo acted with willfulness, premeditation, and deliberation in the commission of the attempted murders that took place before and after the shooting of Sahagun that he acted with the same mental state when he aided and abetted Gomez in the shooting of Sahagun. The statements did not lessen the burden of proof and do not constitute misconduct.

Lazo further contends that the prosecutor committed misconduct by misstating the evidence when he argued that Lazo handed the gun to Gomez prior to Gomez "exiting the vehicle" just before she shot Sahagun. We reject the argument. The prosecutor argued that, after Gomez shot Tommy A., Lazo had possession of the gun during the attempted murders of Michael L., Benjamin G., and Anthony E. prior to reaching the intersection of Santa Gertrudes and Alicante. The prosecutor then stated that Lazo "gives that gun to . . . Gomez just like he did with [the shooting of] . . . Tommy [A.] . . . [¶] . . . . He had to turn that gun over to . . . Gomez because he's used it immediately before. He knows what . . . Gomez is capable of. He has told her what to do. He has seen her do it. And he hands that gun over to her when they pull up to the Sahaguns."

The assertion that Lazo handed the gun to Gomez during the short time between his attempted murders of Michael L.,

Benjamin G., and Anthony E.—all of which took place within minutes of Gomez's shooting of Sahagun—is a reasonable inference, particularly in light of his handing of the gun to Gomez for the purpose of shooting Tommy A. about one-half hour earlier. The comment is not misconduct.

Lazo next argues that the prosecutor misstated the law when he stated: "The premeditation, willfulness and deliberation, it doesn't matter what the female did. It doesn't matter if . . . Gomez had other thoughts in her head. The fact that . . . Lazo . . . had that premeditation and willfulness and deliberation, that intent when he turned that gun over and she ended up shooting and killing him, that makes him liable for first degree murder." Lazo argues that this is incorrect because aiding and abetting the crime of murder requires the defendant to " 'know and share the murderous intent of the actual perpetrator.' (*People v. McCoy*[, *supra*,] 25 Cal.4th [at p.] 1118.)"

Contrary to Lazo's suggestion, the jury could have convicted Lazo of first degree murder by aiding and abetting Gomez even if "Gomez had other thoughts in her head" and did not premeditate or deliberate the murder herself. (See *People v. McCoy*, *supra*, 25 Cal.4th at p. 1122 ["[A] person, with the mental state necessary for an aider and abettor, helps or induces another to kill, that person's guilt is determined by the combined acts of all the participants as well as that person's own mens rea. If that person's mens rea is more culpable than another's, that person's guilt may be greater even if the other might be deemed the actual perpetrator."].)

Because we conclude the prosecutor's challenged comments did not constitute misconduct, Lazo's related arguments that

36

his counsel was ineffective by failing to object to the comments necessarily fails.

## I.    *Senate Bill No. 567*

Lazo contends that Senate Bill No. 567 applies retroactively to his case. Senate Bill No. 567, which became effective January 1, 2022, after Lazo was sentenced but before his case became final, added new requirements to sentencing hearings. Most notably, the law allows the sentencing court to "impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (Stats. 2021, ch. 731, § 1 [enacting § 1170, subd. (b)(2)].) Prior to the enactment of the law, there was no such restriction on the application of upper term sentences, and "the choice of the appropriate term . . . rest[ed] within the sound discretion of the court." (Former § 1170, subd. (b).)

We agree with Lazo and courts that have addressed this issue that the law "applies retroactively in this case as an ameliorative change in the law applicable to all nonfinal convictions on appeal." (*People v. Flores* (2022) 73 Cal.App.5th 1032, 1039; accord, *People v. Wandrey* (2022) 80 Cal.App.5th 962, 981; *People v. Lopez* (2022) 78 Cal.App.5th 459, 465.) Because we reverse three of Lazo's convictions for attempted murder and all of his remaining gang enhancements, the trial court must hold a new sentencing hearing. Lazo will be entitled to benefit from Senate Bill No. 567 at any such hearing.

37

## DISPOSITION

The attempted murder convictions on counts 2, 8, and 14 are reversed based on insufficiency of the evidence. The true findings on the remaining gang enhancement allegations under Penal Code section 186.22, subdivision (b) are also reversed based upon the retroactive application of Assembly Bill No. 333. The court shall resentence the defendant accordingly, and in light of the amendments to Penal Code section 1170 made by Senate Bill No. 567, subject to the prosecution's decision whether to retry the defendant on any of the gang enhancements. The judgment is otherwise affirmed. The court shall prepare an amended abstract of judgment reflecting the modified sentences and forward a copy of the abstract of judgment to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED.

ROTHSCHILD, P. J.

We concur:

CHANEY, J.

BENDIX, J.